•IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 1, 2012

**STATE OF TENNESSEE v. DEAN HEATH**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 10-02252    W. Mark Ward, Judge**

---

**No. W2011-02515-CCA-R3-CD  -  Filed May 23, 2013**

---

A Shelby County Criminal Court Jury convicted the appellant, Dean Heath, of first degree premeditated murder, first degree felony murder, and especially aggravated robbery. The trial court merged the murder convictions and imposed a total sentence of life imprisonment in the Tennessee Department of Correction for the murder conviction and a concurrent twenty-five-year sentence for the especially aggravated robbery conviction. On appeal, the appellant argues that the trial court erred in finding him competent to stand trial and that the evidence was insufficient to sustain his conviction of felony murder. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ROGER A. PAGE, J., joined.

Charles Mitchell, Memphis, Tennessee, for the appellant, Dean Heath.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Ray Lepone and Tracye Jones, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

The appellant's convictions stemmed from the shooting death of the victim, Stephen Faulkner. The appellant's co-defendants in the crimes were Lavette Coleman and Jeremy Williams.

At trial, Peggy Faulkner, the victim's mother, testified that in June 2009, the victim was twenty-nine years old. The victim had an apartment and drove a small, white BMW.

Lavette Coleman[1] testified that she was charged with two counts of first degree murder and especially aggravated robbery for her role in the victim's death. She said that the State had made no promises to her in exchange for her testimony but that she did expect some consideration.

Lavette said that in June 2009, she lived at 4902 Brentdale Avenue with her siblings and her mother, Gwendolyn Coleman. About two or three weeks before the offense, the appellant introduced Lavette to the then twenty-three-year-old Jeremy Williams, who was also known as "J." Williams lived in Cedar Mills Apartments. Lavette and Williams began dating and saw each other almost daily.

Lavette said that Williams spent the night at her house on Friday, June 19, 2009. The next morning, she and Williams discussed ways to get money. She told him that she could "lure Mexicans for the promise of sex" and that the appellant and Williams could rob them. However, Williams did not want Lavette to prostitute herself and said they would find another way to get money. During the conversation, Williams was loading and unloading a black gun that he kept at Lavette's house. Around noon, Williams left the house. At approximately 7:00 p.m., Williams called Lavette and said he had a "proposition" for her. Lavette told him that she was sleeping and that she would call him later.

Thereafter, Williams called Lavette again and said he was coming to her house. Lavette went outside and saw Williams coming into the yard, alone. Williams and Lavette left her house and met the appellant in the area around Clearbrook. The appellant had a gun wrapped in a black shirt, Williams had his gun, and Lavette was unarmed. They discussed Lavette's plan to rob Mexicans and rejected it. The appellant then said, "[L]et's rob the pizza guy." Lavette told the appellant and Williams that they could not have a deliveryman come to her house. Instead, she suggested they lure a deliveryman to a vacant house on her street. They planned to take the deliveryman's money, put him in the trunk of his car, and drive around.

Lavette said the appellant and Williams left her house to find a vacant house. She remained at home and ordered the pizza using her cellular telephone. During the order, she gave the person taking the order a fake name, "Riley," and a false telephone number, (901) 474-5390. Before the order was completed, she gave her correct cellular telephone number

---

[1]Some of the witnesses in this case share a surname. Therefore, for clarity, we have chosen to utilize their first names. We mean no disrespect to these individuals.

for confirmation of the order. Lavette then went to the house the men had chosen, which was at 4890 Brentdale Avenue. The lights were on in the vacant house, and a "For Rent" sign was in the front yard. They removed the sign.

When the deliveryman, who was the victim, called to confirm that the correct address was the "house with the lights on inside," Lavette said it was and told the victim to park in the driveway. The victim parked, got out of the vehicle, retrieved the pizza and drinks from the passenger side of the car, and approached Lavette. She told the victim that Williams, who sitting on the porch with her, would pay for the order. Williams stood, pointed his gun at the victim, and told the victim to "drop [the money] off." The appellant, who had been waiting behind the house, walked around to the front of the house. He was wearing a bandana covering his face and was holding a gun. Williams ordered the victim not to look at him and to lie on the ground. When the victim was on the ground, the appellant searched him and demanded his money.

Lavette said she picked up the pizza and drinks to return the items to the victim's car. She opened the driver's side door and climbed into the back seat. Lavette saw the victim stand and run, and Williams and the appellant chased him. Lavette heard a gunshot that sounded like "a fire cracker," and the appellant said, "Oh, shit, fool." Shortly thereafter, Lavette got out of the car and walked to the backyard of the vacant house. She did not see the appellant, Williams, or the victim. She walked to the front of the house and saw the victim's body on the ground. She began to cry because the victim was dead. Williams called her cellular telephone, but she did not answer and walked toward her house. In front of her house, she stopped and answered her telephone. Williams told her to come to the appellant's house. Instead, she went to a BP gasoline station.

Lavette said that the appellant, Williams, and Williams's two cousins, Benny Bohannon and James Richardson, were at the BP gasoline station. The appellant "was talking about smoking dude." One of Williams's cousins asked the appellant why he killed the victim, and the appellant laughed and said that he had told the victim not to get up. Afterward, they left the BP gasoline station and went to the appellant's house where the appellant and Williams hid their guns in a cabinet drawer. Lavette's mother met her at the BP gasoline station and drove her home. Lavette acknowledged that she did not initially tell her mother the truth about what happened that night. She said she did not call the police because she was scared.

Lavette said that before the robbery and murder, Williams did not have any money. However, while at the BP gasoline station after the robbery and murder, Williams bought juice and cigarettes. Lavette maintained that she did not know the victim would be killed and that she did not know what the appellant and Williams planned to do with the victim after

putting him in the trunk.

On cross-examination, Lavette said that at the time of the offenses, she and the appellant attended Wooddale High School and that Williams was five years older than she was. Lavette said that Williams spent the night with her on June 19, 2009. When they woke the next day at noon, Williams said "he had to go hustle." Lavette thought he meant he was going to sell drugs because he needed money after buying a new gun.

Lavette stated that although she had offered to "sell [her]self" to Mexicans so that Williams and the appellant could rob them and make "easy money," she had never prostituted herself. She reiterated that robbing a pizza deliveryman was the appellant's idea, but she said they never discussed shooting the deliveryman. Lavette said that neither she nor Williams wore a disguise or concealed their faces that night.

Lavette said that after the shooting, they went to the appellant's house. Williams took off his shirt and pants and burned them. She acknowledged that she was upset with Williams because he did not take the victim's cellular telephone and that she knew the telephone records could lead the police to her.

Gwendolyn Coleman testified that in June 2009, she lived at 4902 Brentdale Avenue with her eighteen-year-old daughter, Lavette; her son; and two other daughters. On June 20, 2009, Gwendolyn spent the day at the hospital with her son, who was in the intensive care unit because of diabetes. When Gwendolyn came home that night, she saw two young men on her carport. She said that one of the men was "J" and that the other man was the appellant. Gwendolyn got out of her car, and the appellant put his hand on his chest and said, "[I]f you can't handle Lavette, let me know, I'll control her." Gwendolyn said "a few choice words" and ordered the men to leave her property.

Gwendolyn went inside the house and took a shower. Afterward, Lavette told her she was going to the Exxon gasoline station, and she left. Later, as Gwendolyn was getting dressed to go out, she "heard a pow." Gwendolyn went outside to look for Lavette but did not see her or the two men. Instead, she saw two officers. One of the officers asked if she had heard a gunshot, and she said yes. The other officer was walking around, and his flashlight revealed a body lying face down in a yard. Although an officer told her to go back inside the house, she got into her car and continued to search for Lavette.

Gwendolyn drove to the Exxon gasoline station where Lavette said she was going, but she was not there. Gwendolyn repeatedly called Lavette, but she did not answer her telephone. Ultimately, she answered and told Gwendolyn she was at a BP gasoline station. However, when Gwendolyn checked, Lavette was not there. Thereafter, Lavette called

Gwendolyn, said she was at Cedar Mills Apartments, and asked Gwendolyn to come get her. Gwendolyn refused and told Lavette to meet her at the BP gasoline station. Gwendolyn picked her up there and drove her home.

On cross-examination, Gwendolyn acknowledged that over the course of the evening, Lavette lied to her about going to the Exxon gasoline station, being at the BP gasoline station, and not being involved in the homicide. Gwendolyn confirmed that she had never seen the appellant before that night but asserted that she had seen "J" two or three times before.

Taylor Johnson testified that she and the appellant began dating a couple of months prior to June 2009 and that she saw him on a daily basis. On the morning of June 20, 2009, Johnson was at the appellant's apartment. That afternoon, Johnson and the appellant left the apartment and went to a Wendy's restaurant. Upon their return, Williams was still at the apartment. The appellant and Williams were each "play[ing]" with a revolver; Williams's revolver was black. After the first visit to Wendy's, Bohannon and Richardson came by the appellant's apartment. That evening, the appellant and Johnson again went to a Wendy's restaurant. Afterward, the appellant and Williams left the apartment and returned with Lavette. The appellant and Williams went outside, and Lavette stayed inside, sitting on the couch, "playing with her phone[,] and looking down." Johnson said Lavette appeared nervous, so Johnson went outside and saw Williams burning his shirt. Johnson asked "what was going on," and the appellant told Williams not to reveal what had occurred earlier that evening. However, the appellant said, "We almost had some pizzas." Johnson, the appellant, and Williams went back inside the house, and Lavette's mother called. Johnson heard Lavette say to her mother, "oh, my God and for real." After Lavette's mother called, Lavette and Williams left. Williams returned later and spent the night at the appellant's apartment. Johnson said that the next day before it got dark, the police came to the appellant's apartment.

On cross-examination, Johnson said that in June 2009, she was fifteen years old. She said that on the day of the robbery, she did not hear the appellant and Williams talking about robbing anyone. When the appellant and Williams returned to the appellant's apartment around 11:00 p.m., Williams's mouth was bleeding. Later that night, Williams burned his shirt and pants and threw his shoes on the telephone line. Johnson recalled that on the day of the crime, the appellant was wearing his hair in "corn rows" or braids that were "pulled back." The next day, Johnson and the appellant's mother unbraided the appellant's hair. When the police arrived at the appellant's apartment, they put Johnson and Williams in the back of the same police car. Johnson was upset and asked, "[W]hy am I going to jail, I didn't do anything?" She thought that Williams was trying to "set [her] up."

On redirect examination, Johnson said that while she was in the back of the police car, Bohannon and Richardson walked by, saw what was happening, and headed toward Cedar Mills Apartments. Two BP gasoline stations were located in that direction.

Benny Bohannon testified that he was Williams's cousin and that in June 2009, he was seventeen years old. At that time, Williams usually spent the night at either Bohannon's Cedar Mills apartment or at the appellant's apartment. On the night of June 18, 2009, the appellant came to Bohannon's apartment to "recruit" him and James Richardson to help rob someone. The appellant had a ".38 Special" gun that was chrome with a black handle; Bohannon had seen the appellant with the gun on a couple of other occasions. Bohannon and Richardson refused to participate in a robbery.

Bohannon said that the next day, Williams called and asked him to "come to the gate." When Bohannon complied, he saw the appellant and Williams at the gate. The trio walked toward "the store" on Mendenhall. During the walk, the appellant discussed the robbery. He said that he asked a girlfriend to order a pizza and have it delivered to an abandoned house. The appellant said that when the victim arrived with the pizza, he and Williams pointed their guns at him and told him to get down. Initially, the victim complied; however, he acted scared and got up. The appellant said he told the victim to get down again. The victim complied but then stood and ran. The appellant said he pushed Williams out of the way, and either his gun or Williams's gun hit Williams's lip. The appellant told Bohannon that he shot the victim in the side and that the victim was dead. Bohannon asked what they planned to do, and the appellant said that they had gotten rid of the weapons and their clothes. The appellant told Bohannon they took $40 from the victim and used it to buy marijuana. Bohannon said he left the men and walked back to his apartment while the appellant and Williams continued walking in the direction of the store.

Bohannon said that the same day, he, his mother, and Richardson drove to the store and that he saw the police in front of the appellant's apartment. Bohannon saw some people he could not identify in the back of a police car.

On cross-examination, Bohannon acknowledged that Williams did not say that he killed the victim; the appellant admitted killing the victim.

On redirect examination, Bohannon surmised that the appellant told him about shooting the victim "because he tried to come recruit me the night [before] and then he wanted to let me know that he went without me anyway and handled his business."

Tenieka Owens testified that on the evening of June 20, 2009, she and her sister drove to Tracy Anderson's house, which was located off Brentdale Avenue, to wash their clothes.

Owens had been to Anderson's house more than thirty times and was familiar with the houses in the area. As Owens backed into Anderson's driveway, she noticed a white car parked in the driveway of a nearby vacant house, which she thought was unusual. Two individuals were standing outside the house, but she could not discern their race or gender. One person was wearing black shorts and a white shirt, and the other person was wearing red shorts. Owens turned off the engine and then heard a gunshot. She saw three individuals running from the scene in an eastwardly direction but, again, could not discern their race or gender. Owens said that Anderson called 911, and that, when the police arrived later, Owens told an officer what she had seen.

Memphis Police Officer Quentin Hogue testified that at approximately 11:55 p.m. on June 20, 2009, he was dispatched to 4890 Brentdale Avenue to investigate a report of shots fired at a vacant house. Upon arriving at the scene, he noticed that the lights in the house were on and that a car with an open driver's side door was parked in the driveway. After confirming with dispatch that the house was supposed to be vacant, Officer Hogue looked inside the car and did not see anyone. He saw a cellular telephone on the driver's seat and a pizza warmer bag on the passenger seat. A receipt was on top of the pizza warmer bag. Another pizza warmer bag was lying in the yard. Officer Hogue saw that the door to the house was slightly open. When Officer Hogue's partner arrived, they went inside the house and saw that it was vacant and unfurnished. They also looked in the backyard, but the search revealed nothing.

Officer Hogue said that a neighbor who lived two or three houses down the street came outside, and the officers spoke with her. She told the officers she heard one gunshot. The officers returned to the abandoned car and called the manager of Pizza Hut to see if a delivery driver was missing. Officer Hogue learned that the victim had been dispatched to 4890 Brentdale Avenue, that he had not returned to the restaurant, and that the manager was concerned about him. The officers began searching the area and "a yard over" found the victim's body lying face down on the ground behind a "For Sale" sign. After detecting no signs of life, Officer Hogue called the fire department and his lieutenant. At that point, the scene was secured with crime scene tape.

Anna Burns, the manager of the Pizza Hut restaurant at 5376 Knight Arnold, testified that the victim was a delivery driver and that before a delivery, each driver was given only $20 with which to make change. She explained that most pizza orders were placed by a call to the Pizza Hut "call center" and that the order was then assigned to the closest restaurant location.

Burns said that on June 20, 2009, the victim began work at 8:00 p.m. Burns left the restaurant to run an errand, and when she returned, someone from the call center contacted

her to ask if she had a delivery driver who drove a white BMW. Knowing the victim drove a white BMW, she checked the "delivery screen" and learned that the victim had been gone for over one hour on two deliveries to nearby addresses. One of the orders, which was to be delivered to 4890 Brentdale Avenue, totaled over $89.50. Because the amount of the order was over $50, someone at the call center should have confirmed the order by calling the number from which the order originated. The name on the Brentdale order was "Riley," and two telephone numbers were associated with the order: (901) 474-5390 and an alternate contact number of (901) 605-4401. Burns called the victim's cellular telephone, but no one answered. Burns "panicked" and drove to 4890 Brentdale Avenue. When she arrived, she learned the victim was dead.

Charles Proctor testified that on June 20, 2009, he worked at the Pizza Hut call center as a call service representative. At 10:41 p.m., he took an order totaling $89.50 from a female who provided the name "Riley," the telephone number (901) 474-5390, and the delivery address of 4890 Brentdale Avenue. Proctor noticed that his caller identification system reflected a different telephone number than the one the caller provided. Proctor asked the caller for a contact telephone number to confirm the order, and the caller gave the telephone number (901) 605-4401. Proctor logged the order into the computer, and the order was then sent to the appropriate restaurant location. Proctor said the computer records reflected that the victim left to deliver the order at 11:08 p.m.

Memphis Crime Scene Officer David Payment testified that at approximately 2:00 a.m., he responded to 4890 Brentdale Avenue. Another officer informed him that the victim was in the yard of 4896 Brentdale Avenue and that he had been pronounced dead by the paramedics. Officer Payment saw the victim's body lying face up on the ground behind a "For Sale" or a "For Rent" sign. The body was covered with a blanket and appeared to have a bullet wound in his chest. Two feet south of the victim was a pool of blood.

Officer Payment said that in the front yard of 4890 Brentdale Avenue, he found and collected a blue pizza warmer bag, a pen, white paper that may have been receipts, and silver-colored coins. The victim's BMW 325 was in the driveway with the driver's side door open. A pizza warmer bag was on the front passenger seat. In the backyard, Officer Payment found and collected a silver-colored butter knife. Officer Payment said he went inside the house and found it completely empty and clean.

Retired Memphis Officer Patricia K. Turnmire testified that in June 2009, she was a crime scene investigator and processed the victim's 2001, four-door, white BMW at the crime laboratory. She found the victim's fingerprints on the outside and inside of the vehicle but found no other fingerprints.

Cricket Communications employee Michael Stewart testified that the company's records relating to telephone number (901) 474-5390 reflected that the subscriber was Tracy Cooperwood, whose address was 3241 South Mendenhall, Hickory Hill, Tennessee. The records reflected that at 10:47 p.m. on June 20, 2009, the subscriber's telephone received a call from Pizza Hut's call back telephone number and that the call lasted two seconds. At 11:25 p.m., a call was placed from the victim's telephone to the subscriber's telephone, and the call lasted approximately fifteen seconds. A second call was placed from the victim's telephone to the subscriber's telephone at 11:26 p.m., and the call lasted approximately sixteen seconds.

AT&T employee Timothy Thomas testified regarding the company's records for telephone number (901) 605-4401. The subscriber's name was Lavette Coleman, whose address was 4902 Brentdale Avenue, Memphis, Tennessee. The records reflected that five calls were placed from the subscriber's telephone to the Pizza Hut call center on June 20, 2009: at 10:24 p.m., 10:26 p.m., 10:28 p.m., 10:33 p.m., 10:35 p.m., and 11:24 p.m. The shortest call lasted fifty-one seconds, and the longest call lasted 174 seconds. At 10:47 p.m., a call was placed from the Pizza Hut call center to the subscriber's telephone, and the call lasted nineteen seconds. At 11:26 p.m., a call was placed from the victim's telephone to the subscriber's telephone, and the call lasted seventy-six seconds.

Medical examiner Dr. Miguel Laboy testified that he performed an autopsy on the victim's body on June 21, 2009. Dr. Laboy said the twenty-nine-year-old victim was five feet, eight inches tall and weighed 244 pounds. The victim's death was caused by a gunshot wound to the right side of victim's chest. There was no stippling or soot around the wound, indicating that the bullet was not fired at close range. The bullet entered between the seventh and eighth ribs; perforated the right lung and the diaphragm; lacerated the liver; perforated the pulmonary artery, the aorta, and the left lung; then exited the chest cavity between the second and third left ribs. Dr. Laboy recovered a medium caliber bullet from the front of the victim's left shoulder. He explained that he classified 9 millimeter and .38 caliber bullets as medium caliber. Additionally, there were abrasions to the victim's upper lip, nose, chin, and forehead.

The sole defense witness, the appellant's brother, Lexis Heath, testified that when he woke around 4:00 a.m. on Sunday, June 21, 2009, the appellant, Johnson, Williams, the appellant's ex-girlfriend, and Lexis's mother and sister were in the apartment. During the day, Williams repeatedly walked outside the house then returned approximately five minutes later. Around 12:00 or 1:00 p.m., Lexis's mother and Johnson unbraided the appellant's corn rows. At approximately 3:00 or 4:00 p.m., the appellant left to go to the store with his aunt, Latrina Ayers. When they returned, the appellant had a drink with Lexis. Lexis said that when he was sitting outside on the porch, he saw Bohannon and Richardson walk past

Lexis's apartment from Cedar Mills Apartments. Lexis saw them again while the police were at the apartment.

The jury found the appellant guilty of first degree premeditated murder, first degree felony murder, and especially aggravated robbery. The trial court merged the murder convictions and imposed a life sentence. The court also imposed a concurrent sentence of twenty-five years for the especially aggravated robbery conviction. On appeal, the appellant argues that the trial court erred in finding him competent to stand trial and that the evidence was insufficient to sustain his conviction.

## II. Analysis

### A. Competency to Stand Trial

Regarding competency, the appellant relies on the testimony of Dr. Geraldine Bishop, one of the expert witnesses at the competency hearing, who said that he was not competent to stand trial because he could not understand the nature of the proceedings or actively participate in his defense. In response, the State notes that another expert witness, Debbie Nichols, concluded that the appellant understood the proceedings, the roles of the participants in the proceedings, and the charges against him. Additionally, Nichols concluded that the appellant could assist in his defense. Accordingly, the State asserts that the evidence does not preponderate against the trial court's finding that the appellant was competent to stand trial.

Prior to trial, the appellant filed a motion for a competency hearing. At the hearing, Dr. Bishop, a clinical and developmental psychologist, testified that she interviewed the appellant three times and spent a total of approximately seven hours with him. She reviewed his previous testing materials, his social security records, educational records, court documents, and his statement to the police. She learned that at an early age, the appellant was diagnosed with schizophrenia; however, Dr. Bishop found no indicators of schizophrenia. Dr. Bishop stated that in school, the appellant was "educated as a mildly-retarded student" and worked at a second-grade level. The appellant began receiving social security disability benefits when he was nine years old.

Dr. Bishop said that when she tested the appellant, his IQ was 67 or 68, which was in "the borderline range." She opined that the appellant had "sub-average general intellectual functioning" and that his verbal comprehension was low. She explained that the comprehension test measured "a person's ability to make reasoned judgments and choices in social situations." However, she noted that the appellant's abilities in math were near normal.

Dr. Bishop said that she learned from the appellant's sister, Deanna Heath, that the appellant had a difficult upbringing. Specifically, Deanna told Dr. Bishop that when the appellant was five years old, he and his siblings went to live with their physically abusive maternal grandmother. After their grandmother died, the appellant and his siblings lived with their mother, Mercey Elisara, who neglected them. Deanna said that Elisara made appointments for the appellant to see a psychiatrist but kept only half of them. Additionally, Elisara did not give the appellant the medication the psychiatrist prescribed for his attention deficit disorder, which would have helped him in school. Deanna said that the appellant wanted to attend school but that he had "a chronic acting out problem." The appellant was frequently expelled, and Elisara would delay getting the appellant reinstated. Eventually, the appellant was "dropped from the school rolls for not being there."

Dr. Bishop learned that during the appellant's childhood, there were periods of weeks or months when his family had no utilities and were unable to bathe regularly. The children were teased because they wore ill-fitting, dirty clothes. The appellant's aunt, Trina Ayers, told Dr. Bishop she suspected that Elisara and her friends used drugs.

Dr. Bishop said that the appellant's "ability to process what's going on in a courtroom setting is going to be limited only to the simplest of concepts." When Dr. Bishop asked the appellant about the role of his attorney, the appellant responded, "He tells the judge I didn't do it." Dr. Bishop said:

> [W]hat we know about [the appellant] is that he has never actively done anything to assist in his own defense. He's never spontaneously raised an issue. No one has ever gotten any information out of him where they didn't ask the question first. He just – he does not do anything overtly to protect himself and probably does not know how.

Dr. Bishop noted that the appellant said he had helped his defense by telling his attorney "I didn't do it." The appellant acknowledged that he faced a life sentence. When asked how counsel would defend him, he said that counsel would "[t]ell the judge I didn't do it." Dr. Bishop stated that the appellant

> doesn't really have any understanding of the legal process – doesn't have any understanding of the fact that defenses must be planned; that he can be a participant in the plan[;] he didn't even really understand that he could have a lawyer present with him during the interview where he gave a confession because he thought that a lawyer was somebody that went to court and

-11-

handled your case from the point of view of the court.

Dr. Bishop said that the appellant "did not have the mental capacity to understand the nature of the proceedings like a hearing or a trial." She said that the appellant could communicate with counsel by saying he did not commit the crime and by reciting some of the facts of the events. She noted, however, that the appellant had made no attempt to consult with counsel and had been passive in his defense.

Regarding whether the appellant comprehended his felony murder charge, Dr. Bishop said that the appellant "knows that he was there and that the plan was for robbery; and since he didn't pull the trigger, he does not conceive, in any way, that he could be culpable just by being present during a robbery that ended up in a murder." She said that the appellant did not understand the concept of legal responsibility. Specifically, she noted that the appellant thought he was innocent because he did not pull the trigger. She opined that the appellant was a "follower" who allowed others to make decisions.

On cross-examination, Dr. Bishop acknowledged that she was not a forensic psychologist. She stated that she thought anyone with an IQ around 70 would have difficulty "in the area of abstraction and being able to understand complex legal terms." Therefore, the likelihood of such a person being competent to stand trial was "slim." She said:

> Competency training might teach the individual, in a simplistic way, what are the roles of various people in court. It might teach the person the difference between the prosecutor or the defense attorney – what it is that the judge does. But I think that you would have to be able to ascertain whether or not they could apply the words that they've learned in a meaningful way in order to assist the defense.

She conceded that she did not test the appellant for malingering; however, she maintained that she did not believe the appellant was malingering because he answered all of her questions and did not try to withhold information.

Dr. Bishop said the appellant knew that committing a crime was wrong, but she did not think "he thinks about this stuff in a time-efficient way," which was necessary to assisting counsel in his defense. She stated, "I don't think that it's possible that he planned a shooting; and I think it's very unlikely that he did a significant part of the planning of the actual robbery. I think he just went along. His idea was to be there and to get some money." Dr. Bishop stated that the appellant refused to believe he could go to jail even if he did not pull the trigger. She acknowledged that before the appellant gave a statement to police, he read

-12-

his Miranda rights aloud and said he understood them. Nevertheless, she said the appellant did not understand his Miranda rights.

Dr. Bishop acknowledged that she asked the appellant if he told his attorney what happened during the crime but that she never asked the appellant for the details of the crime. She said she thought "he could recite facts" and said she had read the appellant's statement. Dr. Bishop stated that she did not ask the appellant if his confession was true. She said the appellant knew right from wrong.

The appellant's aunt, Latrina Nikay Ayers, testified that the appellant had difficulty following directions and that he had to be told a couple of times what to do. She said that around his family, the appellant was reserved and kept to himself. She knew the appellant could cook noodles in the microwave; however, she never allowed the appellant to use her stove. She said that she had never seen the appellant watch a movie or television show other than cartoons.

The appellant's sister, Deanna Heath, testified that during childhood, she and her siblings lived with their grandparents. After their grandmother died, they lived with their mother. Deanna had never seen the appellant read a book, but he liked to watch cartoons. She noted that the appellant could cook microwave noodles. She stated that the appellant never started conversations at family gatherings.

The appellant's mother, Mercey Elisara, testified that the appellant always had learning problems and that he received special education in school. She said the appellant had problems following directions and never initiated conversations with her. She noted that the appellant primarily watched cartoons on television.

Clinical social worker Debbie Nichols testified that she was the forensic coordinator at West Tennessee Forensic Services and that she evaluated the appellant for competency to stand trial. Nichols first interviewed the appellant on September 30, 2010. The appellant was cooperative, understood that their conversations were not confidential, and responded appropriately to Nichols's questions. At the beginning of the interview, the appellant did not know the jobs of the prosecutor, the judge, or the jury. However, by the time the interview ended, the appellant knew the roles of the parties in a courtroom proceeding.

Nichols said that she saw the appellant again on May 31, 2011. She said that he was less forthcoming and that he was reluctant to answer questions. From testing, she discovered that the appellant was "putting forth less than a genuine effort to participate in the evaluation." She concluded that the appellant understood the legal process and could participate in his own defense. She said that the appellant told her about his past mental health treatment and that

he was receiving social security disability payments because of his attention deficit disorder. She acknowledged that the appellant appeared to be "somewhat low functioning." The appellant told her that he had prior convictions and that he knew what a plea bargain was.

Nichols said that the appellant told her he could not remember what happened during the crime because his memory was poor. Regardless, the appellant knew the offenses he was being charged with violating and that he was facing a life sentence. She stated that the appellant "was able to talk to me in a logical, goal-directed manner." When Nichols asked the appellant about upcoming hearings, the appellant told her that the hearings were on a motion to "suppress his statement and a motion to stand trial." Upon questioning, the appellant was able to describe the jobs of the various courtroom participants. Nichols asked the appellant "what would happen if he were found not competent, and he said he didn't have to go to trial." The appellant knew that the trial court would determine whether he was competent. Nichols stated that IQ scores did not necessarily relate to competency.

On cross-examination, Nichols acknowledged that she did not review the appellant's social security records, the results of educational testing, or his prior medical diagnoses. She further acknowledged that the appellant once mistakenly thought the prosecutor was on his "side." Nichols explained that she tested the appellant for malingering "because he didn't have memory for things that were convenient; but had memories for things – other things that wouldn't help or hurt his case."

At the conclusion of the hearing, the court noted that to be found competent, the appellant needed to have the mental capacity to (1) "understand the nature and object of the proceedings"; (2) "consult with counsel"; and (3) "assist in the preparation of the defense." The court stated:

> I'm not sure that Ms. Bishop fully understood what the legal criteria [for competency were].
>
> I was quite impressed that she was willing to say that the [appellant] could not assist in the preparation of his defense, but she never asked what the facts were or if the [appellant] had any memory of the facts of this particular incident – or ask him whether he had any witnesses or anything of that nature.
>
> I'm not sure she quite understood what it took to assist in the defense.
>
> All things being said, I have some testimony from these

-14-

two experts. Some of it's not really – a lot of it is not really conflicting. It's just – it's conflicting on the ultimate conclusion but not necessarily on the underlying facts that support it.

Therefore, the court found that the appellant failed to prove that he was incompetent.

Both the federal and state constitutions prohibit subjecting a mentally incompetent accused to trial. See U.S. Const. amend XIV; Tenn. Const. art. I, § 8; Pate v. Robinson, 383 U.S. 375, 378 (1966); State v. Blackstock, 19 S.W.3d 200, 205 (Tenn. 2000). "The standard for determining competency to stand trial is whether the accused has 'the capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense.'" Blackstock, 19 S.W.3d at 205 (quoting State v. Black, 815 S.W.2d 166, 174 (Tenn. 1991)); see also Dusky v. United States, 362 U.S. 402, 402 (1960). The appellant bears the burden of establishing by a preponderance of the evidence his lack of competence to stand trial. State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). On appeal, this court will consider the trial court's findings conclusive unless the evidence preponderates against them. Id.

The trial court noted that the experts essentially agreed on the facts regarding the appellant's competency; however, the court stated that Dr. Bishop apparently misunderstood the test for determining competency to stand trial. Although Dr. Bishop said that the appellant's IQ was 67 or 68 and that the chances were "slim" that an individual with an IQ around 70 could be competent to stand trial, Nichols stated that IQ was not necessarily a factor in determining competency. The proof at the hearing established that the appellant could tell counsel some of the facts of the case and that he could understand simple court concepts. He knew the roles of various courtroom participants, he had previous convictions, and he said that he understood what a plea bargain was. Taking the foregoing into consideration, the trial court found that the appellant failed to establish by a preponderance of the evidence that he was not competent to stand trial. We conclude that there is nothing in the record to preponderate against the trial court's ruling. Therefore, the appellant is not entitled to relief on this issue.

## B. Sufficiency of the Evidence

The appellant maintains that the State adduced insufficient proof to sustain his conviction for felony murder.[2] Specifically, he challenges the proof of his "identity as the

---

[2]The jury found the appellant guilty of both premeditated first degree murder and felony murder. The trial court merged the appellant's conviction for premeditated first degree murder into his felony murder

(continued...)

-15-

culprit," complaining that his "conviction is based upon circumstantial evidence with no fingerprint, DNA or eyewitness testimony other than the shaky account of a cooperating co-Defendant."[3] In response, the State maintains that the evidence was sufficient to sustain the appellant's felony murder conviction, either as the principle offender or under a theory of criminal responsibility.

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

Felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103.

Further, in Tennessee, "criminal responsibility is not a separate, distinct crime. It is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). A defendant convicted under a criminal responsibility theory "is guilty in the same degree as the principal who committed the crime" and "is considered to be a principal offender." Id. at 171. The appellant must "'in some way associate himself with the venture,

_____

[2](...continued)
conviction.

[3]On appeal, the appellant challenges only his conviction of felony murder; he admits his participation in the robbery.

act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)).

In the light most favorable to the State, the proof adduced at trial revealed that the day before the offense, the appellant tried to recruit Bohannon and Richardson to assist in a robbery, but they declined. Lavette, Williams, and the appellant discussed ways to obtain money, and the appellant suggested they rob a "pizza guy." Lavette called Pizza Hut and placed an order to be delivered to a vacant house on the street where she lived. Lavette and Williams waited on the porch of the house, and the appellant waited behind the house. When the victim arrived, Williams pointed a gun at him and demanded that the victim "drop [the money] off." The appellant, who had a bandana over his face, walked to the front of the house and also pointed a gun at the victim. Williams ordered the victim to lie on the ground, and the victim complied. However, the victim eventually stood and attempted to run away. The appellant and Williams chased the victim. Lavette then heard a gunshot, and the appellant said, "Oh, shit, fool." Lavette walked around and saw the victim lying dead in a yard behind a sign. When Lavette saw the appellant later that night, he "was talking about smoking dude." The appellant said he killed the victim because he got up after he and Williams ordered him not to get up. Although Williams had no money before the incident, he was able to buy juice and cigarettes after the shooting. The appellant's girlfriend, Johnson, saw Williams, whose mouth was bloody, burning his clothes at the appellant's apartment after the incident. Williams also threw his shoes on a telephone line. Despite discouraging Williams not to tell Johnson what had occurred, the appellant told her, "We almost had some pizzas." The appellant told Bohannon that he had a girlfriend call a pizza deliveryman to come to an abandoned house, and, when the victim arrived, the appellant pointed a gun at him and told him to get down. Although the victim initially complied, he eventually stood and ran. The appellant said that when he pushed Williams out of the way, either his gun or Williams's gun hit Williams in the lip. The appellant told Bohannon that he shot the victim in the side, that the victim fell to the ground, and that the victim was dead. The appellant told Bohannon that he and Williams got rid of the weapons and their clothes and that they used the $40 they took from the victim to buy marijuana. Dr. Laboy testified that the victim's death was caused by a gunshot wound to the right side of his chest.

From the foregoing, we conclude that a reasonable jury could have found the appellant guilty of first degree murder, either as the principle offender or under a theory of criminal responsibility, during the commission of a robbery.

## III.  Conclusion

In sum, we conclude that the trial court did not err in finding the appellant competent to stand trial and that the evidence was sufficient to sustain the appellant's conviction for felony murder.  Accordingly, the judgments of the trial court are affirmed.

_____
NORMA McGEE OGLE, JUDGE